# In the United States Court of Federal Claims

No. 13-380C

(Filed: March 19, 2014)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|                                              |                                                                                                                                                                                          |
| -------------------------------------------- | ---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| AGILITY DEFENSE & GOVERNMENT SERVICES, INC., |                                                                                                                                                                                          |
| Plaintiff,                                   | IDIQ Delivery Orders; Assumption of Risk under Firm Fixed-Price Contracts; Constructive Changes and Express Changes; Doctrines of Impossibility and Commercial Impracticability. |
| v.                                           |                                                                                                                                                                                          |
| THE UNITED STATES,                           |                                                                                                                                                                                          |
| Defendant.                                   |                                                                                                                                                                                          |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Jon D. Levin*, with whom were *Gary L. Rigney* and *W. Brad English*, Maynard, Cooper & Gale, P.C., Huntsville, Alabama, for Plaintiff.

*Phyllis Jo Baunach*, Senior Trial Counsel, with whom were *Stuart F. Delery*, Assistant Deputy Attorney General, *Bryant G. Snee*, Acting Director, and *Martin F. Hockey*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., *Nathan J. Bankson*, U.S. Army, Of Counsel, for Defendant.

OPINION AND ORDER

WHEELER, Judge.

In this contract dispute, Plaintiff Agility Defense & Government Services, Inc. ("DGS"), formerly Taos Industries, Inc. ("Taos"), seeks an equitable adjustment in the amount of $1,369,377.47 for costs incurred in its completion of a delivery order issued pursuant to its contract with the U.S. Army. The contract at issue is a firm fixed-price, indefinite-delivery, indefinite-quantity ("IDIQ") contract for the purchase of various Soviet-style weapons in support of the U.S. Army's security assistance mission in Afghanistan. DGS's claim is related to its delivery of one of those weapons, the 73 mm SPG-9 recoilless gun. Although DGS originally promised to provide 225 SPG-9s at a fixed total price of $1,319,400.00, it claims that subsequent actions by foreign

governments and contract modifications by the U.S. Government increased its costs to $2,688,777.47. DGS now seeks reimbursement of the difference between the contract price and its actual costs.

As set forth below, the Court reaffirms the well-settled rule that in a fixed-price contract, the contractor bears the risk that its actual cost of performance might exceed the contract price. Accordingly, the Court denies Plaintiff's motion for summary judgment and grants the Government's cross-motion for summary judgment.[1]

Background

On July 12, 2004, DGS entered into an IDIQ contract with the U.S. Army for the procurement of Soviet-style weapons to support the Army's security assistance program in Afghanistan. (Pl.'s Mot. Attach. 1.) The contract provided for the issuance of individual delivery orders on a firm fixed-price basis, and obligated the Government to place orders totaling at least $30,000 in supplies, up to a maximum of $50 million. (Id.) In return, DGS agreed to provide certain Soviet-style weapons, including 73 mm SPG-9 recoilless guns. (Id.) The contract stated that DGS would be provided a "fair opportunity to propose pricing and delivery for each delivery order," and the proposed equipment could be "new, new surplus, used, overhauled, or refurbished," as long as it was in "serviceable, operable condition." (Id.) The contract incorporated various FAR provisions, including FAR 52.216-22, as follows:

> Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; provided, that the Contractor shall not be required to make any deliveries under this contract after <u>2 years after original delivery date</u>.

(Id.) Another provision, FAR 52.243-1, was incorporated as the "Changes" clause, providing for an equitable adjustment in the event of certain changes to the contract made

---

[1] The Government styles its brief as a "Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment." Since both parties rely on evidence outside the pleadings, the Court treats the Government's motion as one for summary judgment. See Brubaker Amusement Co. v. United States, 304 F.3d 1349, 1355-56 (Fed. Cir. 2002) ("Pursuant to RCFC 12(c), the trial court may convert a motion to dismiss into a motion for summary judgment under RCFC 56 if it relies on evidence outside the pleadings.").

by the contracting officer. (Id.) Finally, it incorporated FAR 52.249-8 as the default clause, providing the conditions justifying termination of the contract for default. (Id.)

On December 7, 2007, the Army issued Delivery Order 6, which incorporated the general contract provisions and provided specific order details, such as quantity, price, and delivery dates. (Pl.'s Mot. Attach. 2.) According to those details, DGS agreed to provide 225 SPG-9s at a fixed unit price of $5,864.00, for a total price of $1,319,400.00, on a delivery date of April 7, 2008. (Id.) DGS subsequently sought to obtain the SPG-9s from two different subcontractors, one Hungarian company and one Bulgarian company. (Pl.'s Mot. Attachs. 3-4.) The first attempt failed when the Hungarian government refused to release its weapons, and the second failed when the Bulgarian government did the same. (Id.) Consequently, DGS did not provide the SPG-9s by the April 7, 2008 delivery date, and two years later, it still had not provided the weapons. (Id.)

The two-year mark was significant because, under the terms of the contract, the Army could terminate the contract for default if DGS failed to deliver the weapons, but it could not require DGS to make any deliveries more than two years after the originally scheduled date. (See id.) Consequently, effective April 1, 2010, both parties signed Bilateral Modification 4, agreeing that DGS would "not meet the current delivery date," but instead would "provide 20,000 YAK-B Links as consideration for late delivery." (Def.'s Mot. A34-A36.) The modification further stated that "[t]he revised delivery date is not yet known," and "[a]nother modification will need to be executed when the delivery date is determined." (Id.) From April 1, 2010 to March 10, 2011, DGS was still unable to deliver the SPG-9s, though the parties continued to correspond regarding DGS's performance of the contract. (Pl.'s Mot. Attachs. 3-6.)

Their correspondence culminated on March 10, 2011 with the signing of Bilateral Modification 7, which contained three significant details. (Pl.'s Mot. Attach. 7.) First, because DGS had been unable to acquire "new surplus" SPG-9s, it instead promised to deliver "new production" SPG-9 variants. (Id.) Second, the modification set "firm [delivery] dates subject only to the requirements for actions by the [Government]." (Id.) Third, DGS explicitly agreed to "waive its rights arising from clause 52.216-22, regarding the restriction on not requiring the contractor to make delivery after 2 years after the original delivery [date]." (Id.) However, one detail that is conspicuously absent from Bilateral Modification 7 is an increase in the contract price. (See id.)

On December 24, 2011, DGS completed delivery of the 225 SPG-9s. (Pl.'s Mot. Attach. 8.) On April 25, 2012, it sent a Request for Equitable Adjustment ("REA") to the contracting officer in the amount of $1,369,377.47. (Pl.'s Mot. Attach. 9.) This amount represented the increase in costs DGS incurred to acquire the SPG-9 variants specified in Bilateral Modification 7, rather than the SPG-9s described in the original delivery order.

(Id.)  DGS argued that it had "incurred significant additional costs as a result of actions/ non-actions by foreign sovereign governments outside of [its] control," and "the ONLY costs included in [the] REA [were] the actual costs incurred to procure the SPG-9s less the awarded base unit price of $5,864.00 each for 225 units plus [its] 2011 actual General & Administrative rate."  (Id.)  The contracting officer rejected the REA.  (Pl.'s Mot. Attach. 10.)  DGS then submitted a certified claim, but on January 16, 2013, the contracting officer issued a final decision denying DGS's certified claim as well.  (Pl.'s Mot. Attach. 11.)

On June 7, 2013, DGS filed its complaint in this Court.  The parties have filed cross-motions for summary judgment, as well as response and reply briefs.  The Court heard oral argument on February 18, 2014, and the case is now ready for decision.

Analysis

A.  Standard for Decision

Summary judgment is appropriate where the evidence demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  A "genuine" dispute is one that "may reasonably be resolved in favor of either party," and a "material" fact is one that "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986).  Where the parties have filed cross-motions for summary judgment, the court evaluates each motion on its own merits and makes all reasonable inferences against the party whose motion is under consideration.  Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968–69 (Fed. Cir. 2009).

B.  Discussion

Where, as here, a contractor seeks an equitable adjustment from the Government for additional costs incurred during performance of a firm fixed-price contract, one overarching principle guides the Court's analysis.  This principle states that "[a] firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract.  This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss."  FAR 16.202-1.  Although DGS's legal reasoning is largely opaque and not well articulated, DGS appears to argue for an exception to this principle on three separate bases:  (1) DGS's performance after April 7, 2010 was caused by the Government's constructive change to the contract; (2) its delivery of more expensive goods was required by the Government's express change to the contract; and (3) its failure to deliver

the original, less expensive goods is excused by the doctrine of impossibility. As explained below, none of those arguments has merit.

1. Constructive Change

"A constructive change occurs where a contractor performs work beyond the contract requirements without a formal order, either by an informal order or due to the fault of the Government." Int'l Data Products Corp. v. United States, 492 F.3d 1317, 1325 (Fed. Cir. 2007). When the Government compels work "above and beyond that in the contract," it must compensate the contractor for the costs of the additional work through an equitable adjustment. Id. However, when the Government merely insists on performance in compliance with the contract specifications, no adjustment is warranted. NavCom Def. Elecs., Inc. v. England, 53 F. App'x 897, 900 (Fed. Cir. 2002) (citing S.S. Silberblatt, Inc. v. U. S., 433 F.2d 1314, 1323 (Ct. Cl. 1970)).

DGS asserts that the contracting officer's "insistence on DGS's continued performance [after April 7, 2010], despite its having no obligation to do so pursuant to FAR 52.216-22, constituted a constructive change." (Compl. ¶ 22.) However, this argument blatantly disregards the uncontroverted facts. Effective April 1, 2010, the parties signed Bilateral Modification 4 and waived the original April 7, 2010 delivery deadline. (Def.'s Mot. A34-36.) The description of the parties' agreement stated:

> This no cost modification is being issued to reflect the 20,000 YAK-B Links that TAOS is providing as consideration for late delivery. The current delivery date is 7 April 2010. TAOS will not meet the current delivery date. . . . The revised delivery date is not yet known. Another modification will need to be executed when the delivery date is determined.

(Id. at A36.) That determination was made on March 10, 2011 with the execution of Bilateral Modification 7. That modification stated:

> Any failure by Taos Industries, Inc. to meet the delivery schedule means that the [Government] may terminate the contract for default without further notice, and re-procure with excess costs at the contractor's expense. Taos agrees to waive its rights arising from clause 52.216-22, regarding the restriction on not requiring the contractor to make delivery after 2 years after the original delivery.

(Pl.'s Mot. Attach. 7.)

Thus, DGS's obligation to perform after April 7, 2010 was not the result of the Government's unilateral insistence, but rather the parties' agreement. Indeed, DGS's motivation for extending the delivery schedule is not difficult to perceive. FAR 52.249-8 allows the Government to terminate a contract for default if the contractor fails to deliver supplies in the time specified, and makes the contractor "liable to the Government for any excess costs" incurred by acquiring the supplies from other sources. In this case, DGS not only failed to deliver by the scheduled date, it failed to deliver two years after the scheduled date. It was then that the parties signed Bilateral Modification 4, thereby allowing DGS to perform after April 7, 2010 and avoid default. No constructive change occurred, and thus no reimbursement for a constructive change can be justified.

2. Express Change

Nonetheless, DGS cites FAR 52.243-1 to support its claim for additional costs resulting from the Government's "changed design specifications," meaning the change between the SPG-9s that DGS promised to deliver under the original order and the SPG-9 variants that it eventually did deliver under Bilateral Modification 7. (Compl. ¶¶ 20, 24.) In other words, DGS asserts that it is entitled to an equitable adjustment because it was required to provide "differing and more expensive goods." (Pl.'s Mot. 3.) As above, however, this argument distorts the facts in an attempt to hold the Government solely responsible for an agreement reached by both parties.

Under FAR 52.243-1, when a contracting officer makes certain unilateral changes to a contract that cause an increase in the cost of performance, the contracting officer is required to make an equitable adjustment. In this case, that clause is simply inapplicable. DGS concedes that because it was "unable to procure" the SPG-9s it had originally promised to deliver, it instead "offered to obtain . . . SPG-9 variants." (Compl ¶ 18.) The Government accepted that offer, and the parties subsequently memorialized their agreement in Bilateral Modification 7. Therefore, no change occurred pursuant to FAR 52.243-1, and no reimbursement is warranted.

3. Impossibility

Finally, DGS argues that it deserves an equitable adjustment because procuring the weapons at their original price was impossible, both before April 7, 2010 and after. Over time, the doctrine of impossibility has evolved such that it no longer requires literal impossibility of performance, but merely "a showing of commercial impracticability." Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1294 (Fed. Cir. 2002). A contract becomes commercially impracticable "when, because of unforeseen events, it can be

6

performed only at an excessive and unreasonable cost, or when all means of performance are commercially senseless." Raytheon Co. v. White, 305 F.3d 1354, 1367 (Fed. Cir. 2002) (citations and internal quotation marks omitted). In such cases, a contractor is entitled to receive an equitable adjustment. Id.

However, there are several limits to the application of the impossibility doctrine. In this case, the most basic limitation is that the doctrine is not available to a party that assumed the risk of occurrence of the supervening event. See Seaboard Lumber, 308 F.3d at 1294 (citing United States v. Winstar Corp., 518 U.S. 839, 904-10 (1996)). DGS complains of increased costs and scarcity of goods, but such market changes are precisely the type of "normal risk" that it assumed when it voluntarily entered into a firm fixed-price contract. Id. at 1295. Indeed, "[b]ecause fixed price contracts do not contain a method for varying the price of the contract in even unforeseen circumstances, they assign the risk to the contractor that the actual cost of performance will be higher than the price of the contract." Allegheny Teledyne Inc. v. United States, 316 F.3d 1366, 1376 n.7 (Fed. Cir. 2003) (quoting Dalton v. Cessna Aircraft Co., 98 F.3d 1298, 1305 (Fed. Cir. 1996)). DGS assumed that risk, and now seeks to avoid its consequences, but there is simply no justification for allowing it to do so.

## Conclusion

For the reasons set forth above, Plaintiff's motion for summary judgment is DENIED, and the Government's motion for summary judgment is GRANTED. The Court directs the Clerk to enter judgment in favor of Defendant. Pursuant to Rule 54(d) of the Court, reasonable costs are awarded to the Government.

IT IS SO ORDERED.

s/ Thomas C. Wheeler<br>
THOMAS C. WHEELER<br>
Judge